Filed 4/2/13  P. v. Cato CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B238217 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA365074) |
| v. | |
| MICHELLE CATO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Craig Richman, Judge.  Affirmed.

Eric R. Larson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and David E. Madeo, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted defendant Michelle Cato of one count of second degree murder in violation of Penal Code section 187, subdivision (a)[1] (count 1) and one count of attempted murder in violation of sections 664 and 187, subdivision (a) (count 2). The jury found that in the commission of count 1, defendant personally used a firearm, personally and intentionally discharged a firearm, and personally and intentionally discharged a firearm causing death within the meaning of section 12022.53, subdivisions (b), (c), and (d). In count 2, the jury found the firearm allegation pursuant to section 12022.53, subdivision (b) true, but found the allegations pursuant to section 12022.53, subdivisions (c) and (d) not true.

The trial court sentenced defendant to a total term of 57 years to life in state prison. In count 1, the court imposed a 15-years-to-life term, plus 25 years to life pursuant to section 12022.53, subdivision (d). In count 2, the court imposed a consecutive seven-year term, plus 10 years pursuant to section 12022.53, subdivision (b).

Defendant appeals on the grounds that: (1) the trial court prejudicially erred by improperly restricting her proffered psychiatric expert testimony in support of her claim of imperfect self-defense; and (2) the trial court prejudicially erred by refusing to instruct the jury on the lesser included offenses of voluntary manslaughter and attempted voluntary manslaughter based on sudden quarrel.

## FACTS

**Prosecution Evidence**

On the morning of November 21, 2009, Earley Nicolis went to a park located at Fifth Street and San Julian Street in Los Angeles. There, he saw defendant, whom he had known and seen at the park for approximately one and a half months. Nicolis sat down at a table in the park with defendant, Chevon Quinn, and another friend called Dmya. Nicolis received a phone call. After he hung up, he discussed the call with Quinn and then called his godsister, "Pocahontas," to discuss it with her.

---

[1] All further references to statutes are to the Penal Code unless stated otherwise.

2

While Nicolis spoke with Pocahontas, defendant interrupted and told Nicolis that he had said something that was incorrect. Nicolis said he had not, and defendant contradicted him. Nicolis asked, "Why are you in my phone conversation in the first place?" Defendant replied, "Because I can." She seemed angry, and an argument ensued. During the argument, defendant "began saying 'Avalon.'" Nicolis said, "I don't give a fuck what you talkin' about." Defendant said, "You disrespectin' me." Pocahontas said to Nicolis on the phone, "You know she from Avon." "Avon" is a term of disrespect used to describe Avalon Gardens gang members. Nicolis then said, "I don't give a fuck if she from Avon." At that point, defendant took a swing at Nicolis, but she missed. Defendant then left the park saying, "I'll be right back."

Nicolis had parked his red Pontiac about two blocks from the park. When he returned to his car about three hours later, he found it had been vandalized. The windshield was broken, and the phrase "A's Up" was scratched into the hood and side of the car. Nicolis testified that, a few weeks before his argument with defendant, defendant had seen Nicolis stopped at a red light. Defendant had said, "Hey, you have a nice car."

Two days after the argument, at approximately 3:40 in the afternoon of November 23, 2009, Nicolis returned to the park and sat down at a table with Quinn and Nicolis's mother, Sheila Zaldana. When defendant arrived with another female, Dominique, Nicolis approached defendant at the park entrance. Defendant did not appear to be intoxicated. Nicolis asked her why she had keyed his car. Defendant replied, "Because you disrespected me." Defendant reached in her waistband for a small knife that she had. Nicolis said, "I don't give a fuck about your knife. You are going to jail for vandalizing my car." Defendant then showed Nicolis a gun in the right side of her waistband. She kept it in her waistband but grabbed the trigger. By this time, Quinn and Zaldana were standing near Nicolis. Nicolis said, "She has a gun." Quinn said, "Call the police."

Nicolis took out his cell phone and called 911. As he spoke with the dispatcher, he followed defendant out of the park because she was walking away. Defendant walked around a porta-potty and then south on San Julian Street toward Sixth Street. Nicolis followed her at a distance of approximately 15 feet. Zaldana and Quinn followed Nicolis.

3

Defendant talked on a cell phone as she walked. At some point, defendant turned around and "tried to pull the trigger" on Nicolis. The gun did not fire. Zaldana said, "Run, Earley." Defendant said "Run?" as if to say "you got the nerve to tell him to run." Nicolis demonstrated how defendant simultaneously chambered a round in her handgun and said that she "cocked" the gun. As defendant was doing this, Zaldana said, "'You are not going to kill my son. You got to kill me first.'" Defendant lunged forward toward Zaldana and pulled the trigger. Defendant shot Zaldana in the head. Zaldana took two steps back and fell. When Nicolis saw no movement by his mother, he began running after defendant, who had fled as soon as she pulled the trigger. A surveillance recording from a camera at 523 San Julian Street captured the shooting and was played for the jury.

Defendant ran to Sixth Street and turned right. Nicolis was at a distance of approximately 46 feet behind her. Defendant did not look back. Nicolis saw her throw the gun down and slow her pace to a walk.

Nicolis and Quinn were walking in the middle of the street. While pointing at defendant, they waved their arms to Officer Mario Ontiveros of the Los Angeles Police Department (LAPD), who was passing on his motorcycle. Quinn said defendant had a gun, and the officer drew his firearm and detained defendant. Nicolis ran up to them while screaming, "She just shot my mom in the head." Nicolis and defendant began to fight, and the officer separated them. Other officers arrived and asked Nicolis where the gun was. Nicolis said that defendant threw the gun away near the corner. He showed LAPD Detective Charles Baley where he had seen the gun drop. Detective Baley found the chrome semiautomatic handgun. The gun was loaded with three CCI .25-caliber ball point bullets, including one in the chamber. LAPD Officer Paul Valencia searched defendant for weapons and found a silver folding knife in her front pants pocket. LAPD Detective Thayer Lake investigated the crime scene and recovered a .25-caliber bullet casing from a gutter just south of 523 San Julian Street. He did not find a knife on Zaldana, and he saw no knife near the body.

LAPD Officer Kevin Study was one of the officers who helped Officer Ontiveros detain defendant. He and his partner drove about a block to 523 San Julian Street, near

4

the corner of Fifth Street, as directed by Nicolis. They found Zaldana lying on the sidewalk, unresponsive, not breathing, and bleeding from the head. Officer Study set up a crime scene and called 911. Zaldana died from a gunshot wound to her right temple.

Detective Lake spoke with defendant at 9:30 p.m. on the day of the shooting. She did not appear to be under the influence of any drugs. Officer Ontiveros also testified that defendant did not appear intoxicated when arrested.

At approximately 10:00 p.m. on the day of her arrest, defendant was in a holding cell at the LAPD central station. LAPD Officer Angel Guerra searched the holding cell after defendant was removed and found a CCI .25-caliber ball point bullet wedged between the bench and the wall.

Nicolis acknowledged that he had a pocket knife on him during the incident. He did not display it to anyone or use it. To his knowledge, his mother and Quinn had no weapons. At no time during the incident did he threaten defendant with doing anything other than calling the police on her. Neither Zaldana nor Quinn threatened defendant.

Firearms expert Carole Acosta inspected the gun found at the corner of San Julian and Sixth Streets and found that it fired only intermittently, possibly due to dirt and other defects. She stated that the shell casing found at the shooting scene was fired from this handgun. She concluded that one of the bullet fragments found in Zaldana's body was fired from this firearm. The gun required at least four and three-quarters pounds of pressure on the trigger in order to fire.

Officer Armando Leyva testified as a gang expert. He described aspects of gang culture and stated that the Avalon Gardens Crips gang consists of 160 members. "A's up" is a greeting among Avalon gang members, and "Avon" is a disrespectful term for them. Defendant had many gang tattoos on her arms, photographs of which were shown to the jury. Officer Leyva believed that defendant was an active gang member and committed the shooting for the benefit of the gang.

**Defense Evidence**

Defendant testified that in November 2009 she was friends with Nicolis, Zaldana, and Quinn. On the morning of November 21, 2009, she drank and smoked marijuana.

5

When she and Nicolis got into an argument about what he had said over the telephone to Pocahontas, she and Quinn were joking about it, but Nicolis was upset. He said he did not have to explain himself "to no bitch," and "This is Hoover business." He said, "I don't give a fuck about an Avon." Then he kicked defendant under the table, and she stood up and swung at him but missed. Defendant did not feel comfortable anymore, so she walked to her car and left. She denied vandalizing Nicolis's car that day or at any time.

On November 23, 2009, at about 2:30 p.m., a friend named Dominique drove defendant to the park at San Julian and Sixth Streets. They had been drinking, and they smoked a blunt. Defendant was carrying a box cutter and a gun. She carried them because she had been robbed and beaten up in the area. Before she got to the entrance of the park, Nicolis approached. He, Zaldana, and Quinn stopped defendant. Nicolis said, "Why the fuck did you scratch my car? You are gonna pay for it." Defendant replied, "I didn't." Nicolis, Zaldana, and Quinn all said that defendant "scratched his car up." Defendant turned and walked away toward Wall Street. When Nicolis and Quinn blocked her path, defendant turned and tried to beat them to San Julian Street. When Nicolis and Quinn blocked her path again, defendant pulled out her box cutter, which was folded. Nicolis loudly said, "I don't give a fuck about that knife, bitch," and pulled out his own knife. Zaldana and Quinn each had a knife as well.

Defendant put her knife away and tried again to leave toward Wall Street, but the three cut her off again. Defendant told Dominique to get her car so that defendant could get out of there. Dominique left, and Nicolis said, "You not goin' nowhere without payin' for my car." Defendant tried to call her mother with her cell phone, but she could not reach her. Near the corner of San Julian and Fifth Streets, she lifted her shirt to show the gun in her waistband. Nicolis called out to Quinn, "This bitch got a gun." Quinn said, "Call the police on this bitch."

While Nicolis and Quinn were talking to each other, defendant was able to get to San Julian Street, and she began walking quickly toward Sixth Street. Nicolis followed, saying, "You ain't gonna get away with this shit. You go pay for my window."

6

Defendant heard him say, "When you get out the eye of the camera, I'm a blow your head off." When he said that, defendant "freaked out" and "blacked out." It "register[ed]" with defendant because she used to work security and patrol that area. She "sort of" had a sense of where the cameras were. If she had taken a step further, she would have been out of the eye of the camera. She turned around and pointed the gun at Nicolis to scare him. She turned to walk away again and she heard Nicolis say he was going to "blow her head off," so she turned back again. She was scared and the gun went off. There was silence for a couple of seconds and then Nicolis and Quinn started chasing her again. She believed Nicolis had a gun on him because he said he was going to blow her head off.

Defendant stated that she had been raped and molested when she was 12 and again when she was 15 and 17. She was beaten up a couple of days prior to the shooting incident. She took several drugs, including PCP, crystal methamphetamine, marijuana, and alcohol. Being chased made her flash back to all the times that someone had put hands on her or she had been beaten or threatened. She felt that Nicolis was going to try to kill her. Defendant said the gun went off because she was scared. She heard it go off after she had already turned around. She denied that she tried to kill anyone that day. Defendant thought that her life was in danger and that it was necessary to shoot Nicolis. Defendant had seen Nicolis get into a fight with two girls in October 2009. This made her afraid of Nicolis because "he's quick to fight girls." She knew that Nicolis carried pepper spray and a knife. Defendant was not so drunk that she did not know what she was doing.

Defendant stated that she was affiliated with the Avalon Gardens Crips gang because she grew up in the Avalon Gardens projects. She no longer lived in the gang's territory and was not an active member. She had acquired her tattoos over seven years earlier. The tattoos merely showed where she grew up.

Defendant had carried the handgun for protection for five months before the shooting. She had never shot it before and did not know how to load it. She did not know if it was loaded when she pulled the trigger. Defendant said that she did not pull

7

the trigger on purpose, and she did not pull it more than once. Defendant denied being placed in a holding cell on the day of the shooting. Defendant acknowledged that she had a 2006 conviction for possession of a firearm by a felon and a 2008 conviction for possession of marijuana for sale.

LAPD Detective Camille Armstead interviewed Nicolis and Quinn on November 23, 2009, at 4:15 p.m. Nicolis did not tell her that he was carrying a knife. Nicolis said that defendant was the only person to have a weapon at the time of the shooting.

A recording of a 911 call made by the person reporting Zaldana's shooting was played in court. The transcript of the call reveals that a male voice is heard to say, ". . . don't touch the knife."

Dr. Ronald Markman, a psychiatrist, discussed posttraumatic stress disorder (PTSD) resulting from domestic violence. He stated that a person with a history of drug abuse, who had been a victim of sexual assault, might perceive things differently than someone else. That person might also act out in highly impulsive and self-protective ways. Persons with dysfunctional backgrounds can still form an intent to kill.

**Prosecution Rebuttal Evidence**

Detective Lake examined the crime scene around the victim's body. He did not find a knife. No knife other than the one found on defendant was booked into evidence in this case.

Officer Chris Reza testified that on March 3, 2009, while on patrol, he arrested defendant in an unrelated incident near the Avalon Gardens housing development. Officer Reza saw a Black male holding his waistband run toward and enter the open passenger door of a car. Officer Reza and his partner followed the car. It eventually stopped and all of the occupants except the driver fled. Defendant was one of those who fled, and Officer Reza found her hiding in a bush nearby. Along the path that defendant had taken, Officer Reza found a .25-caliber semiautomatic handgun that was missing its magazine. The magazine, loaded with six live rounds, was later recovered. While testifying in that case, defendant admitted to being an Avalon gang member.

8

Officer Ontiveros observed defendant walking just before he took her into custody. She did not stagger, smell of alcohol, or slur her words. Defendant exhibited no signs of alcohol consumption at all when she was detained. He observed her for approximately 15 minutes.

## DISCUSSION

## I. Restriction of Defense Psychiatric Expert Testimony

### A. *Defendant's Argument*

Defendant contends that the trial court improperly restricted her proffered expert psychiatric testimony. The limitations imposed by the court prevented defendant from fully presenting her claim of imperfect self-defense, which was otherwise viable. Defendant argues that, because the error struck at the heart of her defense, it warrants reversal of her conviction under the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).

### B. *Proceedings Below*

Near the close of the prosecution case, the trial court conducted an Evidence Code section 402 hearing on the issue of Dr. Markman's proposed testimony for the defense, to which the prosecutor had objected. Defense counsel argued that Dr. Markman would testify to the basis for a defense of imperfect self-defense (a *Flannel* defense).[2] He would not testify to the ultimate issue of the defense, i.e., that defendant honestly believed in the need to defend herself. Dr. Markman would also discuss the facts and circumstances behind his opinion. Counsel explained that defendant was molested when she was 12, was raped, and was beaten up two days prior to the November 21, 2009 shooting. Dr. Markman was familiar with the police reports and defendant's preliminary hearing testimony related to these prior incidents. After consultation with Dr. Markman, defense counsel stated, "what he's saying is that, generally speaking, somebody that experienced what she experienced could very well have these types of fears," and that her fear would

---

[2]      *People v. Flannel* (1979) 25 Cal.3d 668, 682 (*Flannel*).

9

be reasonable under the circumstances. The prosecutor interjected that Dr. Markman would not testify about "some PTSD defense, or that we are going to get a whole life history of her through the doctor to explain why she might have been quicker on the trigger under these circumstances. There's nothing in the report that indicates that."

The trial court stated it had not read the *Cortez* case cited by the prosecutor.[3] The court noted that Dr. Markman's later report of October 13, 2011, stated that his opinion in the first and lengthier report of July 18, 2011, remained unchanged: "that Ms. Cato likely lacked the capacity to deliberate based on her use of alcohol and marijuana on the day in question." Dr. Markman additionally stated that "the issues of heat of passion or a *Flannel* defense, i.e., an unreasonable belief reasonably held, are viable positions based on her past history of victimization, but as ultimate issues they are decisions left to the trier of fact, i.e., the judge and/or the jury."

The court pointed out that Dr. Markman's first report of July 13, 2011, stated that "'based upon my evaluation and review of the available record, there is no data to suggest diminished actuality, i.e., an inability to premeditate, deliberate, harbor malice aforethought, and the intent to kill as a result of an underlying mental disorder. But it would appear that Ms. Cato's ability to deliberate was impaired as a result of her acute alcohol/ P.C.P. use.' It then goes on to state, 'There are, however, three additional psychiatric legal positions that are viable, the first that Ms. Cato was acting in self-defense based on the aggressive behavior of the alleged victims. The second, a *Flannel* defense indicating that she [had] an unreasonable but honest belief that she had to defend herself based on past experience with the alleged victims, thereby negating malice aforethought. And a, third, a heat of passion explanation as a result of the confrontation with people she felt were there to harm her.' So I'm not really certain which of those three Dr. Markman's testimony would go to, since we are not talking about past experiences with the alleged victims that I'm aware of."

---

[3] The trial court was most likely referring to *People v. Cortes* (2011) 192 Cal.App.4th 873, on which defendant relies in this case.

10

Dr. Markman then testified at the Evidence Code section 402 hearing. After expressing his opinion, the trial court asked him, "So your opinion is based solely—and if I could paraphrase what you are saying. And correct me if I'm wrong—that she had diminished actuality based upon alcohol and drug abuse?" Dr. Markman answered, "Yes." Dr. Markman added that "when you have an individual with the history that she presented, there are very—there are very, very sound arguments that can be presented for those. And I would talk in general terms, but not specifically for—for this—this—" The court asked, "To the facts of this case?" Dr. Markman replied, "because I am precluded from doing so."

The court stated, "Under those circumstances, should Ms. Cato testify that she had a history of drug and alcohol abuse, including on the day in question, and should she testify to all of the other factors considering her alleged rape and child molestation—and I'm not certain whether those are the same incident or not—I will allow Dr. Markman to testify in general terms how incidents such as those would affect a person's honest ability to perceive threats. Right, Dr. Markman? That's what you are telling me?" Dr. Markman replied, "Yes."

On the following day, during cross-examination of defendant, defense counsel and the prosecutor again argued before the court regarding Dr. Markman's proposed testimony. The trial court stated that Dr. Markman could not render an opinion based upon the specific facts involving defendant. The court believed Dr. Markman would testify to the fact that defendant has some kind of PTSD or something like that. And that was all that he would be allowed to testify to—to say that persons who have those kinds of psychological or psychiatric problems react in certain ways to certain stimuli. The prosecutor argued, "He can't use it in terms of her. That was the court's ruling. The court stated, " . . . it cannot apply directly to her. It can only be a general description of posttraumatic stress disorder or battered wife syndrome, or whatever he's going to proffer as the clinical title of whatever he's diagnosing Ms. Cato to try to explain."

With the jury present, on direct examination by defense counsel, Dr. Markman testified that he was familiar with the facts of defendant's case from reviewing multiple

11

police reports, transcripts of court proceedings and interviews with defendant, mental health records, and the murder book. Defense counsel asked Dr. Markman if some of the patients he dealt with who have mental disorders were also victims, such as victims of sexual assaults and general assaults. Dr. Markman said they were—such as in domestic assaults within families. He testified that PTSD occurs any time a person is faced with a life-threatening situation either to himself or a loved one. He said that PTSD "is a very highly likely diagnosis" and "we see that very commonly in young men who . . . have seen military action." When requested by defense counsel, he explained battered women's syndrome to the jury.

Dr. Markman said he had interviewed defendant one time. When asked his opinion as to whether, generally speaking, someone who might have a history of alcohol and drug abuse or been the victim of assault, might perceive things differently than someone else, Dr. Markman said it depended on the situation. Obviously, dysfunctional events in a person's upbringing have a major impact on his or her ability to interact and solve problems. Many times the solutions are dysfunctional. When asked if such persons can perceive things differently, he replied, "Yes." He stated that they can act out in highly impulsive and self-protective ways. "They misinterpret events in their immediate environment. Particularly, if they—if they have been repeatedly abused, they see the world as an abusive place, and they have a very difficult time making contact in a positive manner with anyone in general." Defense counsel asked if they can overreact to a different situation than someone else, and Dr. Markman replied that they can, depending on the perception that they have. They might do things that other people would not do given the same set of circumstances. The defense asked no further questions.

On cross-examination, the prosecutor stated, "And the two basic descriptions that you have given for people in these, as you put it, 'dysfunctional circumstances,' you gave two general descriptions of someone with posttraumatic stress. Is that correct?" Dr. Markman replied, "I was speaking in generalities. But I've mentioned posttraumatic stress." The prosecutor asked Dr. Markman to clarify if battered women's syndrome

12

involved a cycle of abuse in a domestic ongoing "live-in" relationship, and the doctor confirmed that it did. He stated, "I was just answering the questions I was asked." Dr. Markman confirmed that a dysfunctional background can have a major impact on a person. The prosecutor elicited from Dr. Markman, who is an attorney as well, that people from difficult backgrounds or who have been abused can still form an intent to kill, deliberate in the legal sense, and carefully weigh considerations for and against the choice whether to kill. The prosecutor also elicited that the ultimate question of the defendant's state of mind was for the jury to decide and it was not the doctor's opinion to give.

### C. *Relevant Authority*

We review a trial court's ruling on the admissibility of evidence questions for an abuse of discretion. (*People v. Hoyos* (2007) 41 Cal.4th 872, 898.) A trial court's ruling will not be disturbed unless it exercised discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1113, disapproved on another point in *People v. Rundle* (2008) 43 Cal.4th 76, 151.)

Section 25 provides that evidence concerning a defendant's "intoxication, trauma, mental illness, disease, or defect shall not be admissible to show or negate capacity to form the particular purpose, intent, motive, malice aforethought, knowledge, or other mental state required for the commission of the crime charged."

Section 28 provides that "[e]vidence of mental disease, mental defect, or mental disorder shall not be admitted to show or negate the capacity to form any mental state, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act. Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime in charged."

Section 29 provides that, in the guilt phase of a criminal trial, "any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall

13

not testify as to whether the defendant had or did not have the required mental states . . . for the crimes charged.  The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact."

### C.  *No Prejudicial Error or Abuse of Discretion*

The leading California Supreme Court case on the application of sections 25, 28, and 29 is *People v. Coddington* (2000) 23 Cal.4th 529, overruled on another point in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069 (*Coddington*).  In that case, before the guilt phase of a capital murder trial, the court ruled that the defense could offer relevant evidence on mental defect or disease.  (*Id*. at p. 582.)  However, neither party could ask the psychiatric expert about whether or how any defect or disease would affect the defendant's mental state or actuality or if it would impair his ability to form intent or to deliberate or premeditate, unless the expert testified outside the presence of the jury that he believed the defendant did not have the required mental state.  (*Ibid*.)  The California Supreme Court found this ruling was an overly restrictive reading of the statutory limitations.  (*Ibid*.)

*Coddington* explained:  "Sections 28 and 29 permit introduction of evidence of mental illness when relevant to whether a defendant actually formed a mental state that is an element of a charged offense, but do not permit an expert to offer an opinion on whether a defendant had the mental capacity to form a specific mental state or whether the defendant actually harbored such a mental state.  An expert's opinion that a form of mental illness can lead to impulsive behavior is relevant to the existence *vel non* of the mental states of premeditation and deliberation regardless of whether the expert believed appellant actually harbored those mental states at the time of the killing."  (*Id*. at pp. 582-583, fn. omitted.)  "Sections 28 and 29 do not preclude offering as a defense the absence of a mental state that is an element of a charged offense or presenting evidence in support of that defense.  They preclude only expert opinion that the element was not present."  (*Id*. at p. 583.)  The *Coddington* court ultimately concluded that the trial court's erroneous ruling did not justify a reversal of the judgment, since the defendant could have presented evidence of his mental illness at the guilt phase, but he did not, and the issue

14

was therefore not properly preserved. (*Id*. at pp. 583-584.) Even assuming error, it was not prejudicial because there was no evidence that mental illness affected the defendant's ability to premeditate and deliberate, and the facts showed extensive evidence of premeditation and deliberation. (*Id*. at p. 584.)

*People v. Aris* (1989) 215 Cal.App.3d 1178 (*Aris*), disapproved on another point in *People v. Humphrey* (1996) 13 Cal.4th 1973, 1089, held that the trial court properly excluded proposed expert testimony that the defendant shot the victim in honest self-defense while he slept and that this was reasonable. (*Id*. at p. 1194.) The *Aris* court deemed it erroneous, however, "not to permit [the expert] to testify, based on her experience and BWS [battered woman syndrome] theory, as to how the defendant's particular experiences as a battered woman affected her perceptions of danger, its imminence, and what actions were necessary to protect herself." (*Id*. at p. 1198.) The proposed testimony that the defendant was a battered woman and how this affected her perceptions and conduct "stops short of the ultimate issue of what defendant's perception actually was and, therefore, does not violate section 29." (*Ibid*.) The testimony was relevant to show that the defendant genuinely believed she was in imminent danger of serious bodily injury. (*Id*. at p. 1199.)

*People v. Nunn* (1996) 50 Cal.App.4th 1357 (*Nunn*) offers a concrete example of the statutory limits on an expert's opinion regarding the defendant's state of mind. The *Nunn* court stated that Penal Code sections 28 and 29 "allow the presentation of detailed expert testimony relevant to whether a defendant harbored a required mental state or intent at the time he acted." (*Nunn*, at p. 1365.) The court went on to conclude that "it was permissible for Dr. Lipson to opine that appellant, because of his history of psychological trauma, tended to overreact to stress and apprehension. It was permissible for him to testify such condition could result in appellant acting impulsively under certain particular circumstances. Dr. Lipson could have evaluated the psychological setting of appellant's claimed encounter with the men at the fence and could have offered an opinion concerning whether that encounter was the type that could result in an impulsive reaction from one with appellant's mental condition. What the doctor could not do, and

15

what the defense proposed he do here, was to conclude that appellant had acted impulsively, that is, without the intent to kill, that is, without express malice aforethought. The court acted properly in excluding Dr. Lipson's opinion that appellant fired his weapon impulsively." (*Ibid*.)

Defendant chiefly relies on *People v. Cortes*, *supra*, 192 Cal.App.4th 873 (*Cortes*), which, in addition to its own analysis of the issue, summarized the facts and reasoning of other leading cases, such as *Coddington*, *Nunn*, *Aris*, and several others. (*Cortes*, at pp. 902-908.) *Cortes* observed that "[n]o case has been cited to us, nor have we found one ourselves, which even remotely suggests that it is proper under sections 25, 28, and 29 to preclude *all* testimony about the accused's own diagnosis, or mental condition, at the time of the offense, but instead limit the expert's testimony to diagnoses or mental conditions 'in the population at large,' and their 'effects on a general person's behavior who might have that symptom.'" (*Cortes*, at p. 909.) The *Cortes* court stated that, "sections 28 and 29 do not prevent the defendant from presenting expert testimony about any psychiatric or psychological diagnosis or mental condition he may have, or *how that diagnosis or condition affected him at the time of the offense*, as long as the expert does not cross the line and state an opinion that the defendant did or did not have the intent, or malice aforethought, or any other legal mental state required for conviction of the specific intent crime with which he is charged." (*Cortes*, at p. 908, italics added.)

In *Cortes*, the defendant was charged with the stabbing death of the victim. The court held that the trial court abused its discretion in limiting the testimony of a psychiatric defense expert to the subject of dissociation and PTSD in general, and excluding any testimony at all about the defendant's mental condition and the effect on him at the time of the offense. (192 Cal.App.4th at pp. 892, 909.) According to *Cortes*, in all of the cases it cited, "evidence was presented from which the jury could have properly inferred, from testimony that fell short of expressing an opinion that the defendant lacked the specific intentional state required for the charged crime, that the defendant actually lacked such intent." (*Id*. at p. 912.) Such testimony is not prohibited

16

by sections 25, 28, and 29, but is exactly the type of testimony sections 28, 29, and the case law permit. (*Cortes*, at p. 912.)

In the instant case, it appears the trial court and the parties became mired in the "legal 'bog'" that is demarcated by sections 25, 28, and 29. (See *Nunn*, *supra*, 50 Cal.App.4th at p. 1364.) As explained in *Nunn*, section 28 permits a qualified expert to testify that a defendant suffers from a particular mental defect, disorder, or disease and to describe and explain the symptoms and effects of the condition, including the types of behavior or mental processes that can be expected from people suffering from the particular condition or conditions, and the actual effects of the condition or conditions on the defendant. The consequences of the condition must, of course, be relevant to "whether a defendant harbored a required mental state or intent at the time he acted." (50 Cal.App.4th at p. 1365.) Here, the final ruling by the trial court limited Dr. Markman to testifying to a general description of whatever the doctor labeled defendant's "diagnosis," and to saying that persons who have "those kinds of psychological or psychiatric problems" react in certain ways to certain stimuli, and it prohibited the doctor from applying it directly to defendant. Therefore, the ruling constituted an abuse of discretion.

The issue then becomes whether defendant was prejudiced thereby. According to defendant, there are several reasons why it is reasonably probable she would have achieved a better result if she had been permitted to buttress her contention of imperfect self-defense with the appropriate expert testimony by Dr. Markman. First, citing defense closing argument, defendant argues that she admitted to being the shooter and presented the defense at trial that she acted in imperfect self-defense; therefore the error in limiting the expert testimony struck directly at the heart of her defense. Second, the prosecutor took advantage of the error during his closing argument. Third, the jury's rejection of the gang allegation demonstrated that the alleged motive for the shooting was not believed by the jury. Therefore, had the jury been presented the appropriate psychiatric testimony in support of imperfect self-defense, it is reasonably probable that one or more jurors would have harbored a reasonable doubt as to that defense. Fourth, the bystander's comment on

17

the 911 call, telling someone not to touch the knife, corroborated defendant's testimony that Nicolis and the others had knives.

We observe initially that Dr. Markman's proposed testimony differs significantly from the proffered testimony in *Cortes*. The "core" of the report by the psychiatric expert in *Cortes* was that the defendant in all likelihood entered a dissociated state in response to the "'extreme stress of a perceived life-threatening danger.'" (*Cortes*, *supra*, 192 Cal.App.4th at p. 893.) The report went on to describe in detail the characteristics of such a state and the defendant's reported experience. (*Id*. at pp. 893-894.) The expert concluded that the defendant's behavior was consistent with an act of self-defense and the mental state described in the report. The expert's testimony at the Evidence Code section 402 hearing was very detailed regarding dissociation, as well as defendant's history and personality and how they related to his behavior during and after the stabbing. (*Cortes*, at pp. 894-898.) The trial court ruled that the expert could not testify to anything remotely connected to the defendant's diagnosis or history. (*Id*. at pp. 899-900.)

In the instant case, it does not appear that Dr. Markman diagnosed defendant with any particular psychiatric condition. Dr. Markman's emphasis was on defendant's "diminished actuality" due to alcohol and drug intake. Dr. Markman's report of July 18, 2011—which he confirmed as still valid in his October 13, 2011 report—stated that there was "no data to suggest diminished actuality, i.e., an inability to premeditate, deliberate, harbor malice aforethought, and the intent to kill as a result of an underlying mental disorder." Voluntary manslaughter, either heat of passion or unreasonable self-defense, were described merely as "viable positions" based on defendant's history of victimization. Dr. Markman apparently was only willing to "render a general opinion" on any such positions. Therefore, it is not clear that the trial court's limitations on the expert testimony struck at the heart of the defense, since Dr. Markman's proffered testimony would not have been a strong affirmation of that defense. The *Cortes* court concluded that, in that case, the trial court's ruling destroyed any defense that defendant possessed with regard to premeditated and deliberated murder by prohibiting any testimony about the defendant's mental condition. (*Cortes*, *supra*, 192 Cal.App.4th at

p. 912.)  Thus, the jury had no basis from which to infer that the defendant had lapsed into a dissociated state and might not have deliberately premeditated inflicting 13 stab wounds. (*Ibid.*)  Here, however, there was no diagnosis of any mental illness in Dr. Markman's report, which was the basis of his testimony.  Moreover, as respondent points out, defendant continually told the jury that the shooting was an accident.

It is true that the prosecutor discussed Dr. Markman's testimony in his closing argument and noted the lack of specificity in the doctor's testimony.  The prosecutor stated, "What did he offer you in this case?  Nothing.  He offered you—he said there's some certain things about posttraumatic stress syndrome that involve combat veterans.  We don't have a combat veteran case.  Certain syndromes called battered women's syndrome.  Women who are victims of domestic violence and the cycle of abuse.  This isn't a domestic violence case.  He gave no opinion.  He gave general principles of, you know, people who come, have dysfunction in their life, you know, might possibly be more likely to act unreasonably.  Okay.  Well that—but he didn't apply them to these facts.  There's no opinion.  There's no medical opinion that anyone can give that can tell you anything other than that she acted with malice, she acted out of anger and frustration."

The *Cortes* court noted that the prosecutor in that case "took full advantage" of the trial court's limitation of the expert testimony.  (192 Cal.App.4th at p. 912.)  The *Cortes* prosecutor emphasized the number of stab wounds as a ground for a verdict of first degree murder, and because of the limitation of the evidence, was able to argue that there was no explanation for the 13 stab wounds *except* premeditation and deliberation.  (*Ibid.*)  The prosecutor dismissed the expert's testimony as "'a lot of general information.'" (*Ibid.*)  Similar to the prosecutor in this case, he pointed out that PTSD was "about warfare."  The *Cortes* prosecutor disparaged the evidence about the defendant's upbringing as "so much whining." (*Ibid.*)

Although in *Cortes* the court did not state that the prosecutor took *unfair* advantage of the trial court's ruling, it was implied, as it is by defendant in this case.  Unlike *Cortes*, however, there was no proffer of detailed testimony about defendant's

19

multiple diagnoses recognized in the DISM (Diagnostic and Statistical Manual of Mental Disorders). (See *Cortes*, *supra*, 192 Cal.App.4th at p. 897.) In *Cortes*, these included "adjustment disorder with emotional and conduct problems, attachment problems related to personality development, and psychiatric problems that could be characterized variously as PTSD, anxiety disorder or psychophysiological instability." (192 Cal.App.4th at p. 910; see also *People v. Reyes* (1997) 52 Cal.App.4th 975, 981, 984 [prejudicial error to exclude proposed expert testimony on element of knowledge that defendant had, inter alia, "'a schizophrenia, paranoid, antisocial, and borderline style of personality disorder,'" and deficits in cognitive functioning].) In this case, in contrast to *Cortes*, the prosecutor's dismissal of Dr. Markman's testimony was not due to the exclusion of precise and detailed psychological expert testimony regarding defendant. As we have stated previously, Dr. Markman's testimony was not curtailed to the extreme that the *Cortes* expert's was, if at all. Rather, it appears the doctor testified largely as he intended to testify. After consulting with Dr. Markman at the Evidence Code 402 hearing, defense counsel explained the proposed testimony to the court by saying, "generally speaking, somebody that experienced what she experienced could very well have these types of fears." The prosecutor's use of that general testimony during argument was not unduly prejudicial to defendant. It is well established that a prosecutor enjoys wide latitude during argument to describe the deficiencies in defense counsel's tactics and in counsel's version of the facts. (*People v. Bemore* (2000) 22 Cal.4th 809, 846; *People v. Sassounian* (1986) 182 Cal.App.3d 361, 396.) Moreover, the jury was instructed that, "[i]n their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence." (CALCRIM NO. 222.)

We do not believe that the jury's rejection of the gang allegation—an allegation that was urged by the prosecutor as an underlying motive—necessarily indicated that one or more jurors would have harbored a reasonable doubt as to whether defendant acted in imperfect self-defense if the jury had heard appropriate psychiatric testimony. In this case, the gang evidence was relatively weak. A reasonable juror could have determined that, at the moment defendant shot Zaldana and attempted to shoot Nicolis, she was not

20

acting for the benefit of the Avalon gang with the specific intent to further their criminal activities. She was outside of her gang's territory, and she did not shout out any gang name. She did not even mention her gang that afternoon from the time the incident began until the shooting. This was not a premeditated murder exacting punishment for disrespecting a gang, as the jury's second degree murder verdict indicates. A reasonable jury could have determined that, at the moment she shot at her victims, defendant's motives were personal. On a related point, we note that the defendant in *Cortes* was convicted of first degree murder, and the court included in its assessment of prejudice the fact that the evidence of premeditation and deliberation was not overwhelming. (*Cortes*, *supra*, 192 Cal.App.4th at p. 913.) In the instant case, there was strong evidence in support of defendant's conviction of second degree murder at a minimum.

The overheard comment regarding a knife, made by an unidentified person during the 911 call that reported Zaldana's shooting, is of little significance. Clearly the comment did not corroborate that Nicolis and the others had knives, as defendant suggests. The defense did not show who made the comment or what knife was being referred to. The police found no knives on or near Zaldana.

Finally, we note that the jury found that defendant "personally and intentionally discharged a firearm," causing death, within the meaning of section 12022.53, subdivision (d) in count 1, despite defendant repeatedly saying that it was an accident in her trial testimony. This finding indicates that the jury did not find defendant's version of events to be credible. Given the vague and inconclusive nature of Dr. Markman's report and hearing testimony, we believe it is not reasonably probable that, had the jury heard what little more Dr. Markman may have had to say about defendant's mental state (within the limits imposed by sections 28 and 29), the verdict would have been more favorable for defendant. In other words, it is not reasonably probable that even one juror would have held out for a verdict of voluntary manslaughter based on unreasonable self-defense. (*Watson*, *supra*, 46 Cal.2d at p. 836; *People v. Soojian* (2010) 190 Cal.App.4th 491, 519, 521.)

**II. Lack of Instruction on Lesser Included Offenses of Voluntary Manslaughter and Attempted Voluntary Manslaughter Based on Sudden Quarrel**

### A. *Defendant's Argument*

Defendant contends the trial court erroneously refused her request to instruct the jury on voluntary manslaughter and attempted voluntary manslaughter on a sudden quarrel theory, despite there being sufficient evidence of provocation. Defendant maintains that the error is arguably of federal constitutional magnitude, requiring review under the standard of *Chapman v. California* (1967) 386 U.S. 18.

### B. *Proceedings Below*

During the conference regarding proposed jury instructions, the trial court indicated that it would read instructions on first and second degree murder, attempted murder, perfect self-defense, imperfect self-defense, voluntary intoxication, and accident. Defense counsel noted for the record that he had requested an instruction on heat of passion for voluntary manslaughter, and the trial court had denied it. The trial court confirmed this and stated, "this is a self-defense or nothing—or imperfect self-defense."

### C. *Relevant Authority*

"The trial court is charged with instructing upon every theory of the case supported by substantial evidence . . . ." (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047.) "Substantial evidence is evidence of reasonable, credible value." (*People v. Crew* (2003) 31 Cal.4th 822, 835; *People v. Quintero* (2006) 135 Cal.App.4th 1152, 1165.) The failure to instruct on a lesser included offense is reviewed de novo. (*People v. Licas* (2007) 41 Cal.4th 362, 366.)

Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) Voluntary manslaughter is the intentional but nonmalicious killing of a human being. (§ 192; *People v. Manriquez* (2005) 37 Cal.4th 547, 583.) Voluntary manslaughter is a lesser included offense of murder. (*Manriquez*, at p. 583.) A killing may be reduced from murder to voluntary manslaughter if it occurs "upon a sudden

quarrel or heat of passion on sufficient provocation,"[4] or if the defendant "kills in the unreasonable, but good faith, belief that deadly force is necessary in self-defense." (*Ibid*.)

"A heat of passion theory of manslaughter has both an objective and a subjective component. [Citations.]" (*People v. Moye* (2009) 47 Cal.4th 537, 549.) To satisfy the objective, or reasonable person, element of heat of passion voluntary manslaughter, the defendant's heat of passion must be attributable to sufficient provocation. (*Ibid*.) "To satisfy the subjective element of this form of voluntary manslaughter, the accused must be shown to have killed while under 'the actual influence of a strong passion' induced by such provocation. [Citation.]" (*Id*. at p. 550.) "'Heat of passion arises when "at the time

---

[4] The jury instruction for voluntary manslaughter, heat of passion, CALCRIM No. 570, reads as follows: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. [¶] The defendant killed someone because of a sudden quarrel or in the heat of passion if: [¶] 1. The defendant was provoked; [¶] 2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured (his/her) reasoning or judgment; [¶] AND [¶] 3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment; [¶] Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection. [¶] In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time. [¶] It is not enough that the defendant simply was provoked. The defendant is not allowed to set up (his/her) own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment. [¶] [If enough time passed between the provocation and the killing for a person of average disposition to 'cool off' and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis.] [¶] The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder."

23

of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." [Citations.]' [Citation.]" (*Ibid.*)

A defendant may not set up his or her own standard of conduct and justify or excuse his acts because his passions were aroused, unless the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable person. (*People v. Manriquez, supra*, 37 Cal.4th at p. 584; *People v. Oropeza* (2007) 151 Cal.App.4th 73, 82-83.) "A defendant may not provoke a fight, become the aggressor, and, without first seeking to withdraw from the conflict, kill an adversary and expect to reduce the crime to manslaughter by merely asserting that it was accomplished upon a sudden quarrel or in the heat of passion. The claim of provocation cannot be based on events for which the defendant is culpably responsible." (*Oropeza*, at p. 83.)

Attempted voluntary manslaughter is a lesser included offense of attempted murder.[5] (*People v. Gutierrez* (2003) 112 Cal.App.4th 704, 708.) Attempted voluntary manslaughter, like attempted murder, requires proof of the intent to kill. (*People v. Montes* (2003) 112 Cal.App.4th 1543, 1549-1550.) "When relying on heat of passion as a partial defense to the crime of *attempted* murder, both provocation and heat of passion must be demonstrated." (*Gutierrez*, at p. 709.)

---

[5]     The jury instruction for attempted voluntary manslaughter, heat of passion, CALCRIM No. 603, is similar to CALCRIM No. 570 with additional elements, as follows: "The defendant attempted to kill someone because of a sudden quarrel or in the heat of passion if: [¶] 1. The defendant took at least one direct but ineffective step toward killing a person; [¶] The defendant intended to kill that person; [¶] The defendant attempted the killing because (he/ she) was provoked; [¶] The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is , from passion rather than from judgment; [¶] AND [¶] 5. The attempted killing was a rash act done under the influence of intense emotion that obscured the defendant's reasoning or judgment."

If the trial court fails in its duty to instruct on a lesser included offense supported by the evidence, the error is one of state law alone. (*People v. Breverman* (1998) 19 Cal.4th 142, 165.) It does not require reversal unless an examination of the entire record establishes a reasonable probability that the error affected the outcome. (*Id*. at p. 178; *Watson*, *supra*, 46 Cal.2d at p. 836.)

### D. No Error

We believe the trial court did not err in refusing to give an instruction on heat-of-passion voluntary manslaughter or attempted voluntary manslaughter . There was no substantial evidence in this case of a sudden quarrel or heat of passion. "Adequate provocation . . . must be affirmatively demonstrated." (*People v. Lee* (1999) 20 Cal.4th 47, 60.) No substantial evidence was presented that any provocation by Zaldana or Nicolis was sufficient to cause an ordinary person of average disposition to be so inflamed as to lose reason and judgment and begin firing a gun. (*People v. Thomas* (2012) 53 Cal.4th 771, 813.)

The prosecution case showed that Nicolis was walking approximately 15 feet behind defendant when she turned and pulled the trigger. The gun misfired. Zaldana said, "Run, Earley," and defendant said "Run?" Zaldana told defendant, "You are not going to kill my son. You got to kill me first." Defendant "cocked" the gun, and as we saw in the video footage, lunged toward Zaldana, shooting her in the head. Neither Nicolis nor Zaldana had touched defendant or sought to detain her. They were only calling the police about her gun, which she had brandished, and which constituted wrongdoing on her part.

Because there was no evidence of provocation in the prosecution case, it was defendant's burden to affirmatively demonstrate provocation and heat of passion sufficient to enable the jury to find these elements beyond a reasonable doubt. (*People v. Dixon* (1995) 32 Cal.App.4th 1547, 1552.) Defendant's testimony failed to do so. The only encounter that may have been characterized as a quarrel occurred at the entrance to the park where Nicolis demanded to know why defendant had vandalized his car. Defendant did not attempt to shoot anyone at that point. She merely brandished her gun

and then walked away. She testified that Nicolis threatened her while he followed her, and she claimed the "gun went off" by accident, not that she shot in anger during a quarrel. Defendant said that when Nicolis threatened her, she turned around and pointed the gun at him to scare him. After a few moments, defendant turned around again and the gun accidentally discharged. In fact, rather than recalling that she shot the gun, she stated that she merely *heard* it go off. Defendant did not testify that she shot at Nicolis or Zaldana in response to any sudden quarrel. We note that defendant herself insisted she was not angry, but only scared, before she shot Zaldana. Under defendant's version of events, the instructions of voluntary manslaughter based on unreasonable self-defense were the only voluntary manslaughter instructions warranted. The requested instruction on heat of passion would have been inappropriate and likely to confuse the jury, since defendant did not testify that she possessed any passionate feeling at the time the shots were fired.

We also conclude that any error in not reading the jury the requested instructions was harmless under any standard. (*Chapman v. California*, *supra*, 386 U.S. 18; *Watson*, *supra*, 46 Cal.2d at p. 836; see *People v. Breverman*, *supra*, 19 Cal.4th at pp. 165, 178.) The evidence was strong that defendant committed second degree murder of Zaldana at a minimum. CALCRIM No. 520 instructed the jury that, in order to convict defendant of murder, the People were required to prove malice aforethought, which may be either express or implied. In addition to explaining express malice, which occurred if defendant unlawfully intended to kill, the jury was told that implied malice occurred when the defendant intentionally committed an act, the natural and probable consequences of which were dangerous to human life, and when defendant knew at the time she acted, her act was dangerous to human life. After pulling the trigger and having the gun misfire at Nicolis at close range, defendant cocked the gun and pulled the trigger again, killing Zaldana. The evidence thus established overwhelmingly that defendant committed murder. The evidence was also strong that defendant committed the attempted murder of Nicolis, firing at him at close range. The jury necessarily could not have found that defendant acted rashly after being sufficiently provoked.

26

**<u>DISPOSITION</u>**

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


                                        BOREN, P.J.

We concur:


ASHMANN-GERST, J.


CHAVEZ, J.